**NOTE**

31 ☽ⁿ

March 26, 2004                          Lansing                          Mi.
[Date]                                   [City]                         [State]

2376 Wieman Road, Beaverton, Michigan  48612
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    16,500.00        (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is

Howard LaDuke, Jr.                                                    . I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of        7.00        %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the     1st   day of each month beginning on May  1,  2004
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  My monthly payments will be applied to interest before principal.  If, on April 1, 2014
, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
I will make my monthly payments at  ,

or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 191.58

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment."  When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge.  The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note.  If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;  and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     Fifteen
calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be    5.00%
of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**EXHIBIT** A

MULTISTATE FIXED RATE NOTE-Single Family-FNMA/FHLMC UNIFORM INSTRUMENT                Form 3200 12/83
Amended 5/91

If I am in default, the Note Holder may send me a written notice telling me that if I . so not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
Andrea Nicole Matkovic                  -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

[Sign Original Only]

Form 3200  12/83

---------------------------------------------|Space Above This Line For Recording Data|---------------------------------------------

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on  March 26, 2004.
The mortgagor is     Andrea Nicole Matkovic, an unmarried woman

whose address is

1604 Biltmore Blvd
                                      ("Borrower"). This Security Instrument is given to
                                      Lansing, Michigan  48906

Howard LaDuke, Jr., an unmarried man

and whose address is   2376 Wieman Road, Beaverton, MI  48612

("Lender"). Borrower owes Lender the principal sum of

Sixteen Thousand Five Hundred Dollars and Zero Cents
                  Dollars (U.S. $     16,500.00       ). This debt is evidenced by Borrower's
note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt,
if not paid earlier, due and payable on      April 1, 2014                          . This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph
7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements
under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and
convey to Lender with the power of sale, the following described property located in

Gladwin                                                         County, Michigan:

Lots 422 and 423, Whitney Beach No. 8, Hay Township, Gladwin County, Michigan, as
recorded in Liber 8 of Plats, Page 30, Gladwin County Records.

which has the address of        2376 Wieman Road,            Beaverton,

Michigan        48612                    ("Property Address");

MICHIGAN - Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3023 9/90  (page 1 of 6 pages)

EXHIBIT

# NOTE

March 26, 2004                     Lansing,                          Mi.
[Date]                               [City]                          [State]

2376 Wieman Road, Beaverton, Michigan 48612
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 16,500.00  (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
Howard LaDuke, Jr.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 7.00 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the 1st day of each month beginning on May 1, 2004.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on April 1, 2014, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
I will make my monthly payments at
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 191.58

## 4. BORROWER'S RIGHT TO REPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.
I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Andrea Nicole (Matkovic) -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

[Sign Original Only]

Form 3200 12/83

MICHIGAN - Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3023 9/90 (page 1 of 4 pages)

------------------------------[Space Above This Line For Recording Data]------------------------------

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on March 26, 2004.
The mortgagor is   Andrea Nicole Markovic, an unmarried woman

1604 Biltmore Blvd

Lansing, Michigan   48906   ("Borrower"). This Security Instrument is given to

Howard LaDuke, Jr., an unmarried man

and whose address is   2376 Wieman Road, Beaverton, MI 48612

("Lender"). Borrower owes Lender the principal sum of

Sixteen Thousand Five Hundred Dollars and Zero Cents
Dollars (U.S.) $   16,500.00
). This debt is evidenced by Borrower's
note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt,
if not paid earlier, due and payable on   April 1, 2014.   This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph
7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements
under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and
convey to Lender with the power of sale, the following described property located in
Gladwin   County, Michigan:

lots 422 and 423, Whitney Beach No. 6, Hay Township, Gladwin County, Michigan, as
recorded in Liber 8 of Plats, Page 30, Gladwin County Records.

which has the address of   2376 Wieman Road,   Beaverton,

Michigan   46612   ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

the Property insured against loss ' ...ire, hazards included within the term "exten... d coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at

the option of Lender, if mortgage i...rance coverage (in the amount and for the ... p...d ...) that Lender requires) provided by an insurer approved by Lender...again becomes available and is obtained. Borro...er shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in paragraph 14. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument without charge to Borrower.

23. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security instrument. [Check applicable box(es)]

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ Balloon Rider    ☐ Rate Improvement Rider    ☐ Second Home Rider
☐ V.A. Rider    ☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Andrea Nicole Markovic
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

------------------[Space Below This Line For Acknowledgment]------------------

STATE OF MICHIGAN
Eaton County ss.

On this 25th day of March, 2004, before me, a Notary Public in and for said County and State, personally appeared Andrea Nicole Markovic, the individual(s) who executed the foregoing instrument and acknowledged that did examine and read the same and did sign the foregoing instrument, and that the same is free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

My Commission expires:    May 29, 2004

Karin Camille Bulger
Eaton
County, Michigan    Notary Public

This instrument was prepared by
(Seal)

Karin Camille Bulger
Notary Public, Eaton County, MI
My Comm. Expires May 29, 2004

EXHIBIT

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                    Chapter 7 No. GL-04-13723

Andrea N Matkovic

Debtor,                    Hon. James D. Gregg

**ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND WAIVING**
**THE PROVISION OF FRBP 4001(a)(3)**

Movant, Mortgage Electronic Registration Systems, Inc, as nominee for Lender and

Lender's successors and assigns, by and through its attorneys, Trott & Trott, P.C., having

filed a Motion For Relief From The Automatic Stay with respect to the real property

located at 2376 Wieman Rd., Beaverton, MI 48612-9454; and the approximate market value

of the property is $110,000.00;  and the current debt owing to Movant is approximately

$92,375.52, which includes but is not limited to $700.00 for the Attorney fees and costs for

filing this Motion; and any surplus on the sale of this property shall be distributed pursuant

to applicable state law and procedures; and any deficiency on the sale of this property shall

be treated as an unsecured debt; and the Court being in receipt of the Motion and Certificate

of No Response, and the Court being fully advised in the premises:

IT IS HEREBY ORDERED that the Automatic Stay as to the Movant, Mortgage

Electronic Registration Systems, Inc, as nominee for Lender and Lender's successors and

assigns, is hereby lifted. This Order is effective immediately upon entry by this Court

notwithstanding the provision of FRBP 4001(a)(3). This Order shall be binding and

effective despite any conversion of this bankruptcy case to a case under any other chapter

of Title 11 of the United States Bankruptcy Code.

Dated    12-31-04

U.S. Bankruptcy Judge

Trott & Trott, P.C.
30400 Telegraph Rd
Suite 200
Bingham Farms, MI
48025-5822
Phone 248-642-2515
Facsimile 248-642-2523

SENT BY: UAW.LSP;    09988408565;    FEB-24-05-15:59;    PAGE 4

# STATE OF MICHIGAN
## IN THE 55TH CIRCUIT COURT

HOWARD J. LADUKE, JR.

    Plaintiff

v

CASE NUMBER: 05-1905-CH

HONORABLE KURT N. HANSEN

ANTHONY GUERRERO,
Individually, d/b/a PREMIERE
PROPERTY INVESTMENTS; and
ANDREA MATKOVIC, and
MORTGAGE HOTLINE, INC, d/b/a
AMERICAN MORTGAGE
DECISIONS, and FIRST MAGNUS
FINANCIAL CORPORATION,
d/b/a CHARTER FUNDING, and
BNC MORTGAGE, INC. and
MERSCORP, INC., d/b/a MERS
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, and
TROTT & TROTT, PC, and
KENMORE INVESTMENTS, INC.
d/b/a MICHIGAN TITLE
COMPANY, and BRADLEY
KLINE, Individually, d/b/a
PREMIERE PROPERTY
INVESTMENTS, and
THOMAS A. REINBOLD,
Individually and d/b/a REINBOLD
AND ASSOCIATES, INC., d/b/a
RESIDENTIAL APPRAISAL
SERVICES,

    Defendants

ALAN D. WALTON (P31786)
UAW Legal Services Plan
Attorneys for Defendant/Counter-Plaintiff
4139 Wider Road
Bay City, Michigan 48706
Telephone: (989) 684-3300

Mark H. Canady
Foster Swift Collins & Smith
Attorneys for Matkovic & Guerrero
313 South Washington Square
Lansing, MI 48933-2193
Telephone: (517) 371-8100

A TRUE COPY

FEB 24 2005

LAURA E. FLACK
GLADWIN COUNTY CLERK

Exhibit "A"



EXHIBIT

# VERIFIED SECOND AMENDED COMPLAINT

Howard J. LaDuke, Jr., and by his attorney, UAW Legal Services Plan, hereby amends his Amended Complaint in this matter, as follows:

## JURISDICTION

1.  The subject matter of this action (hereafter referred to as "premises") is situated in Gladwin County, Michigan more fully described as follows:

Lots 422 and 423, Whitney Beach No. 8, Hay Township, Gladwin, Michigan

2.  Defendants TONY GUERRERO (hereafter referred to as "Guerrero") and ANDREA MATKOVIC (hereafter referred to as "Matkovic") voluntarily subjected themselves to the jurisdiction of this court by filing the a summary proceeding action against Defendant Howard LaDuke (hereafter referred to as "LaDuke") in the Gladwin County District Court, and stipulating to the Transfer of LaDuke's Counterclaim to this court.

3.  MORTGAGE HOTLINE, INC, d/b/a AMERICAN MORTGAGE DECISIONS (hereafter referred to as "AMD") is a Michigan Corporation, whose resident agent is Rick Badawi, 428 South Crawa Road, Suite A, Lansing, Michigan 48917, and is doing business in Gladwin County, Michigan, including arranging the lending of money secured by real property mortgages in Gladwin County. Matkovic was an employee and agent of AMD until approximately March 15, 2004.

4.   Defendant FIRST MAGNUS FINANCIAL CORPORATION is a foreign corporation, d/b/a Charter Funding (hereafter referred to as "Charter"), whose resident agent is The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan 48025, and is doing business in Gladwin County, Michigan, including arranging the lending of money secured by real property mortgages in Gladwin County, Michigan. Guerrero was an employee and agent of Charter between March 1, 2004 and April 6, 2004.

5.   Defendant BNC MORTGAGE (hereafter referred to as "BNC") is a foreign corporation, whose resident agent is CSC – Lawyers Incorporating Service, 601 Abbot Road, East Lansing, Michigan 48823, and is doing business in Gladwin County, Michigan, including the lending of money secured by real property mortgages in Gladwin County, Michigan.

6.   Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereafter referred to as "MERS") is a foreign corporation, with no registered agent, doing business in Gladwin County, Michigan, including acting as the nominee of lenders of money secured by real property mortgages in Gladwin County, Michigan, and initiating foreclosure proceedings against the premises.

7.   Defendant TROTT & TROTT, P.C. (hereinafter referred to as Trott) is a Michigan professional service corporation whose registered agent is David A. Trott, 30400 Telegraph Road – Ste 200, Bingham Farms, Michigan 48025, doing business in Gladwin County, Michigan, including third party debt collection and conducting mortgage foreclosure sales by advertisement.

8. Defendant KENMORE INVESTMENTS, INC. (hereinafter referred to as "Kenmore") is a Michigan Corporation, d/b/a Michigan Title Company, whose resident agent is James Gawton, 429 Wendover, Muskegon, Michigan 49441 and is doing business in Gladwin County, Michigan, including insuring title to lenders of money secured by real property mortgages in Gladwin County, Michigan.

9. Defendant BRADLEY KLINE, (hereinafter referred to as "Kline"), 911 Larned, Lansing, Michigan 48912 is an individual doing business with Guererro as Premier Property Investments, a purported Michigan Co-Partnership.

10. Defendant REINBOLD AND ASSOCIATES, INC., d/b/a RESIDENTIAL APPRAISAL SERVICES ("is a dissolved Michigan Corporation and Thomas A. Reinbold, its last known principal, individually (hereafter collectively referred to as "Reinbold"), does business in Gladwin County, Michigan, including appraising properties proposed to be secured by real property mortgages in Gladwin County, Michigan.

## FACTUAL ALLEGATIONS

11. Upon information and belief, Guererro and Matkovic acquired real property commonly know as 1604 Biltmore Boulevard, Lansing, Michigan as joint tenants in 2003 and commenced living together at that address.

12. LaDuke suffers from a bi-polar disorder and has been under medical care and on extended disability from his employment because of this condition since 1994.

13. In early 2004, LaDuke contacted AMD for the purpose of obtaining a home equity loan of approximately $13,000, dealing primarily with AMD agent Matkovic. At the time he owed approximately $49,000 on a first mortgage and twice the State Equalized Value of his home was $94,714.

14. Prior to March 3, 2004, Matkovic requested, and LaDuke provided, personal financial information, and details regarding his disabling mental health problems, including lapses in short term memory and an inability to handle his financial affairs.

15. Upon information and belief, Matkovic provided LaDuke's financial and material health information to Guerrero.

16. Upon information and belief, prior to March 3, 2004, Matkovic and Guerrero commenced a scheme to defraud LaDuke of his home and BNC of its funds.

17. On or about March 3, 2004, effective at 7:00 a.m.. Keatmore issued title commitment number 04-501533. Said commitment proposed to provide an owner's title policy to Matkovic for a purchase price of $110,000 and a mortgage policy in favor of BNC in the amount of $88,000.

18. Upon information and belief, on or about March 3, 2004, AMD determined that it would deny LaDuke's mortgage application.

19. Upon information and belief, Matkovic did not advise LaDuke of the denial until several weeks later.

20. Approximately 20 minutes after Matkovic finally advised LaDuke of the denial, Guerrero contacted LaDuke and indicated he would assist LaDuke in obtaining home equity financing for his home.

21. At no time on or before March 31, 2004, did Matkovic or Guerrero advise LaDuke that Matkovic proposed to purchase his home.

22. Guerrero, as an agent of Charter, initiated contact with LaDuke some time between March 3, 2004, and March 31, 2004, and led LaDuke to believe that Charter would provide the mortgage financing that AMD, through its agent Matkovic, had denied.

23. On or about March 8, 2004, Guerrero ordered an appraisal from Reinhold for the premises, which was completed on or about March 11, 2004.

24. On or before March 9, 2004, Charter requested a payoff statement from LaDuke's lender, Homecomings Financial, which provided same to Charter on March 9, 2004.

25. On or about March 15, 2004, Kenmore issued a statement to Charter for its title commitment 04-50133.

26. On or before March 23, 2004, Guerrero and/or Matkovic requested an insurance quote from Farm Bureau General Insurance Company of Michigan to insure the premises effective March 23, 2004, with Matkovic as the owner and occupant of the premises.

27. On or after March 23, 2004, Matkovic and LaDuke allegedly entered into a purchase agreement bearing a date of March 23, 2004, in which LaDuke agreed to sell the premises to Matkovic. Upon information and belief, Guerrero prepared said agreement and presented it to the parties for signing.

The terms of said agreement were as follows:

A. Price $110,000;

B. New Loan $88,000; Mortgage commitment by March 31, 2004;

C. Seller Financing $16,500;

D. Closing on or about April 1, 2004;

E. $250 escrow as security for possession by April 15, 2004;

F. Earnest money deposit $0.

28. Guerrero misled LaDuke as to the nature of the purchase agreement, leading LaDuke to believe it was a document necessary to the processing of his mortgage.

29. On March 24, 2004, Guerrero generated a Good Faith Estimate and Truth in Lending Disclosure Statement on behalf of Charter for presentation to Malkovic.

30. On or before March 26, 2004, Guerrero and/or Malkovic prepared, or caused to be prepared a mortgage and note from Malkovic to LaDuke for a purchase money mortgage of the premises in the amount of $16,500.

31. On March 30, 2004, HNC issued a mortgage commitment to Malkovic.

32. On March 30, 2004, Guerrero and Kline submitted a Premiere Property Invoice to Kenmore charging LaDuke for Property Management in the amount of $28,000.

33. LaDuke had no knowledge of said invoice, and had no agreement with Premiere Property or its partners for any services, nor did he receive any services from Premiere Property or its agents.

34. On March 31, 2004, Kenmore conducted a closing of the transaction.

35. At the closing, Malkovic signed the following documents, all of which indicate her intention to occupy the premises as her primary residence after closing:

A. Estoppel Certificate;

B. W-9 (Request for Taxpayer ID Number);

C. Occupancy Affidavit.

36. One or more of the above documents by their terms were signed to induce BNC to make the loan.

37. At the closing Malkovic signed a Uniform Residential Loan Application prepared by Chircmato indicating the following:

A. She had resided at 1604 Biltmore for 2 years;

B. She was employed as president of Malkovic Cleaning Services;

C. Her income was $4500 per month;

D. She had three listed assets for a total value of $43,000;

E. She had seven listed liabilities totaling $41,960.

38. At the closing Malkovic signed the note and mortgage referenced in paragraph 30 above, with the date altered by hand to March 31, 2004.

39. At the closing Malkovic signed a mortgage on the premises and note in favor of BNC in the amount of $88,000, with monthly payments of $603.90.

40. At the closing Malkovic and LaDUke signed various other standard closing documents.

41. Pursuant to the alleged purchase agreement LaDUke was to receive a mortgage note from Malkovic in the amount of $16,500, with monthly

payments to LaDuke in the amount of $191.58; and approximately $38,500 cash.

42. At the closing Kenmore acted as LaDuke's closing agent and retained a fee of $250 from LaDuke which was the only settlement or closing fee charged to any of the parties.

43. At the closing Kenmore disbursed $8,836.08 to LaDuke.

44. At the closing Kenmore disbursed $28,000 to the Guerrero and Kline partnership Premiere Properties.

45. At the closing, Kenmore did not retain the occupancy escrow of $250.

46. After the closing, Kenmore did not record the Matkovic/LaDuke mortgage securing the $16,500 note.

47. Upon information and belief, Kenmore returned the original $16,500 note to Matkovic.

48. On or about April 6, 2004, Guerrero entered into a "Residential Lease With Option to Purchase" with LaDuke.

49. The two year lease required monthly payments of $850.07 with a 5% credit toward a purchase price of $90,000.

50. In part because the payment on said lease was nearly twice his previous mortgage payment, LaDuke was unable to remain current.

51. Matkovic failed to make payments on the underlying mortgage.

52. On or about September 23, 2004, Matkovic and Guerrero initiated the summary proceeding action which resulted in the transfer of this action to this court.

53. On or about November 8, 2004, Matkovic filed a chapter 7 bankruptcy action in the Western District of Michigan.

54. As part of the bankruptcy, Matkovic filed a Statement of Intention that she would surrender the premises to the secured party, which she identified as Chase Mortgage, an entity not appearing in the chain of title.

55. MERS, through its attorneys, Trott, sought and obtained from the bankruptcy court, the entry of an order granting relief from stay as to the premises on January 4, 2005.

56. Trott has advertised a foreclosure sale date of February 25, 2005, claiming an amount due of $91,536.94.

57. Each paragraph above is realleged and incorporated into each count following.

COUNT I
EQUITABLE MORTGAGE

58. Despite her stated intention to reside in the home, Matkovic had no actual intention to do so. Nor did she intend to purchase the premises as a business or investment property. She anticipated that LaDuke would make payments sufficient to cover the BNC mortgage loan, and that LaDuke would obtain other financing within two years.

59. Matkovic and Guerrero , being aware of LaDuke's poor financial condition, conspired to liquidate and retain LaDuke's equity in the premises, resulting in a gross discrepancy between the benefit received by LaDuke for his home and its true value which Reinbold appraised at $110,000.00.

60. The warranty deed executed by LaDuke on March 31, 2004 was intended to serve as a security for the $59,905.81 received from Matkovic; to wit: the payoff of LaDuke's underlying mortgage balance of $51,069.73, and a cash payment of $8,836.08 received at closing.

61. By virtue of the foregoing, the warranty deed executed by LaDuke to Matkovic was in fact a mortgage to secure the funds paid to LaDuke or on his behalf

62. That in order to obtain funds, Matkovic and Guerrero, individually and as agent for Charter, committed fraud by misrepresenting various aspects of the transaction.

## COUNT II
## QUIET TITLE

63. LaDuke and Defendants BNC and MERS were victims of Matkovic's and Guerrero's fraudulent scheme.

64. Defendants BNC and MERS claim to hold a mortgage on the premises by virtue of a mortgage document executed by Matkovic on March 31, 2004, and recorded at Liber 719, Page 802, Gladwin County Records.

65. The interest in the premises claimed by BNC, MERS and Troth is limited to that which Matkovic held on said date.

66. Matkovic's interest in the property on March 31, 2004, was limited to that of an equitable mortgagee securing the $59,905.81 paid to or on behalf of LaDuke.

67. The amount demanded by BNC, MERS and Troth is $91,536.94 and is based on a mortgage amount of $88,000.00.

68. LaDuke is entitled to credit for payments made to Matkovic or on her behalf, which are not properly reflected in the amount claimed by BNC, MERS and Trott.

69. LaDuke is entitled to a partial release of all claims in excess of the outstanding balance of the equitable mortgage.

## COUNT III
## TRUTH IN LENDING/USURY

70. The proposed transaction between LaDuke and AMD, and later Charter and BNC; and the resultant equitable mortgage between LaDuke and Matkovic constituted a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq.

71. Upon information and belief, AMD, Charter, BNC and Matkovic failed to provide required disclosures to LaDuke.

72. The Annual Percentage Rate in excess of 34% was not disclosed to LaDuke.

73. The legal limit for private real property loans in Michigan is 11% and the penalty for loans in excess of that amount is that the lender is barred from collecting any interest on the loan.

74. Upon information and belief, AMD did not properly process LaDuke's loan application.

75. Upon information and belief, AMD unreasonably denied LaDuke's home equity loan application.

76. As a result of said denial, LaDuke suffered damages, including the loss of the premises and any equity he may have had in it.

77. Charter, through its agent Guerrero, obtained confidential information about LaDuke without his knowledge or authorization.

78. Charter, through its agent Guerrero, initiated a new mortgage application for the purchase of the premises from LaDuke without his knowledge, authorization or agreement.

79. As a result of Charter's actions, LaDuke suffered damages, including the loss of the premises and any equity he may have had in it.

## COUNT IV
## BREACH OF FIDUCIARY DUTY/NEGLIGENCE

80. AMD, through its agent Malkovic, allowed confidential personal and financial information regarding LaDuke to be released to Charter and its agent Guerrero without LaDuke's knowledge or permission, in violation of LaDuke's privacy rights.

81. The information obtained allowed Malkovic and Guerrero to further their scheme to defraud LaDuke.

82. LaDuke suffered damages as a result of the improper release of confidential matters.

83. As the closing agent for the transaction, Kenmore was obligated to LaDuke to properly administer the funds and documents generated from the transaction.

84. Kenmore mishandled funds and documents that LaDuke was entitled to receive.

85. LaDuke suffered damages as a result of Kenmore's breach of its duty.

86. Reinbold had a duty to provide an accurate valuation of the property.

87. Upon information and belief, the property had a market value of approximately $595,000 in March of 2004.

88. Reinbold overvalued the property, which allowed Matkovic and Guerrero to obtain excess funds.

89. LaDuke suffered damages as a result of Reinbold's breach of his duty.

## COUNT V
## UNJUST ENRICHMENT

90. Neither Guerrero nor Kline nor their partnership provided property management or any other services to LaDuke.

91. There was no consideration for the $28,000 paid to them at closing.

92. The invoice and partnership documents were presented at closing in furtherance of their fraudulent scheme to obtain money.

93. They are not entitled to retain the fraudulently obtained funds.

## COUNT VI
## FRAUD

94. Matkovic and Guerrero initiated a scheme to take advantage of LaDuke's mental disability and to defraud LaDuke of the equity in his home.

95. Prior to the time that Matkovic denied the loan application through AMD, Guerrero, as an agent of Chartier, initiated a title search on behalf of Matkovic as purchaser and proposed borrower.

96. Shortly after receiving the results of the title search Guerrero ordered an appraisal on the property in the amount of $110,000.

97. When Matkovic denied the loan application, she falsely represented that her boyfriend Guerrero, would be able to provide LaDuke's home equity financing through his employer, Charter.

98. At the time she made this representation, she knew it was false, having already ordered title insurance with herself as the purchaser of LaDuke's home.

99. Guerrero then contacted LaDuke and falsely represented to LaDuke that he would arrange home equity financing in the amount of $13,500 through Charter.

100. At the time he made the above representation, Guerrero knew it was false, having already initiated the process for Matkovic to purchase the home and to steal most of LaDuke's equity.

101. LaDuke relied on the above representations of Matkovic and Guerrero, as well as those made on March 31, 2004, that the loan closing he attended was to obtain a home equity loan, and that the documents he signed at the closing were for this purpose.

102. LaDuke did not comprehend the nature of the documents he signed and relied upon Matkovic's and Guerrero's representations when he signed them.

103. As a result of Matkovic's and Guerrero's representation, and LaDuke's reliance thereon, LaDuke has suffered both monetary damages in excess of $25,000 and the loss of record title ownership of his home.

104. AMD and Charter are liable for the fraudulent acts of their agents Matkovic and Guerrero.

## COUNT VII
## INJUNCTIVE RELIEF

105. Once the foreclosure sale scheduled by Trott is scheduled by Trott on February 25, 2005, occurs, LaDuke will be unable to reinstate the equitable mortgage, and cannot afford to redeem the property by paying the entire amount demanded.

106. The terms of the equitable mortgage need to be determined by the court so the parties can set correct figures for reinstatement or redemption.

107. LaDuke will suffer irreparable harm if his right to reinstate is eliminated by the sale before the amount necessary, if any, to do so is determined by the court.

WHEREFORE, the Plaintiff prays for the entry of a Judgment granting LaDuke the following relief:

A.    Provide injunctive relief during the pendency of this action postponing the foreclosure sale of the premises until such time as the various rights of the parties can be determined.

B.    Declare that the transaction between Matkovic and LaDuke constitutes an equitable mortgage.

C.    Determine fair and reasonable terms for the repayment of the equitable mortgage and limit the holder of said equitable mortgage to the collection of principal only.

D.    Declare the March 31, 2004, deed from LaDuke to Matkovic and purchase money mortgage from Matkovic to LaDuke to be void ab initio.

B.   Declare that LaDuke is the owner of the premises in fee simple absolute.

F.   Determine the proper successor to the equitable mortgage, if any.

G.   Award damages against Guerrero and Kline in the amount of $28,000 in favor of LaDuke, or in the alternative in favor of the equitable mortgagee, or her successor, as the equities demand.

H.   Award exemplary damages to LaDuke against Guerrero and Charter and such other defendants whose actions are determined to constitute intentional fraud.

I.   Award damages to LaDuke against all defendants jointly and severally, equal to the amount of actual money damages he is found to have suffered as a result of the circumstances set forth above.

J.   Award damages to LaDuke against all defendants jointly and severally, for statutory costs, attorney fees and other indirect damages he is found to have suffered as a result of the circumstances set forth above.

K.   Award such other and further relief as the proofs may show, together with an order for costs and attorneys' fees, plus such other and further remedy as justice and equity demand.



**JURY DEMAND**

A jury trial is demanded on all issues so triable.

Respectfully Submitted,

Dated: February 24, 2005

ALAN D. WALTON (P31786)
UAW Legal Services Plan
4139 Wilder Road
Bay City, Michigan 48706
Telephone: (989) 684-3300

I declare that the statements above are true to the best of my information, knowledge and belief.

Dated: 2/24/05

HOWARD J. LaDUKE, JR.

Subscribed and sworn to before me this 24th day of February, 2005.

Notary Public, Gladwin County, Michigan
My Commission Expires: ____________
Acting in the County of Gladwin

KELLY J. WEISHUHN -
Notary Public, Gladwin Co., MI
My Commission Exp. Oct. 2, 200-

**EXHIBIT**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

IN RE: ANDREA N. MATKOVIC,
Debtor

Case No. 04-13723
Chapter 7
Judge JoAnn C. Stevenson

HOWARD LaDUKE, JR.,
Plaintiff

Vs.

ANDREA N. MATKOVIC,
Defendant

## ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY and WAIVING THE PROVISION OF FRBP 4001(a)(3)

Howard LaDuke, Jr., by and through his Attorneys, UAW-GM LEGAL SERVICES PLAN, having filed a Motion for Relief from the Automatic Stay with respect to the real property located at 2376 Wieman Rd., Beaverton, MI  48612-9454; and his claims against the Debtor in a state court action filed in State of Michigan, 55th Circuit Court, Case No. 05-1905-CH; and the Court being in receipt of the Motion and Certificate of No Response, and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that the Automatic Stay as to the Movant, Howard LaDuke, Jr. is hereby lifted. This Order is effective immediately upon entry by this Court notwithstanding the provision of FRBP 4001(a)(3). This Order shall be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Bankruptcy Code.

Dated _____     _____
                          U.S. Bankruptcy Judge